# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2023 ND 141

Signe Ann Edison,                                          Plaintiff and Appellee

v.

Jeffrey Bryce Edison,                                    Defendant and Appellant

## No. 20220290

Appeal from the District Court of Cass County, East Central Judicial District, the Honorable Tristan J. Van de Streek, Judge.

REVERSED AND REMANDED.

Opinion of the Court by Tufte, Justice, in which Chief Justice Jensen and Justice Crothers joined. Justice McEvers filed an opinion concurring in part and dissenting in part, in which Justice Bahr joined. Justice Bahr filed an opinion concurring in part and dissenting in part, in which Justice McEvers joined.

Michael L. Gjesdahl, Fargo, North Dakota, for plaintiff and appellee.

Benjamin B. Freedman, Fargo, North Dakota, for defendant and appellant.

Jacquelyn S. Lutz, Woodbury, Minnesota, and Linda R. Allen, St. Paul, Minnesota, amicus curiae.

## Edison v. Edison
## No. 20220290

**Tufte, Justice.**

[¶1]   Jeffrey Edison appeals from a divorce judgment and an amended judgment awarding primary residential responsibility for two children to Signe Edison, arguing error in the form of gender bias and in the court's finding that Jeffrey Edison was underemployed for purposes of child support. Signe Edison argues that Jeffrey Edison waived his gender bias argument and, in the alternative, that the trial court's judgment was not based on gender bias. Jeffrey Edison also requests this Court to award the parties equal residential responsibility and impose a "50/50 parenting plan" or reassign the case on remand to a different trial judge. We reverse and remand with instructions to reconsider the best interests of the children under N.D.C.C. § 14-09-06.2(1) and to recalculate any child support obligations.

I

[¶2]   Signe Edison argues Jeffrey Edison waived his gender bias argument because he did not present this issue to the district court when he brought a post-judgment motion "based upon Rule 59 (New Trial; Amending Judgment)." Whether this issue is waived on appeal depends on whether the motion sought a new trial under N.D.R.Civ.P. 59(b). When a party moves for a new trial at the district court, the moving party is later limited on appeal to the grounds presented to the trial court, even if the appeal is also from the judgment itself. *Larson v. Kubisiak*, 1997 ND 22, ¶ 5, 558 N.W.2d 852; *see also Prairie Supply, Inc. v. Apple Elec., Inc.*, 2015 ND 190, ¶ 7, 867 N.W.2d 335; *Riddle v. Riddle*, 2018 ND 62, ¶ 8, 907 N.W.2d 769. For purposes of Rule 59, a "new trial" is defined as "a re-examination of an issue of fact in the same court, after a trial and decision by a jury, court, or referee." N.D.R.Civ.P. 59(a).

[¶3]   Central to the waiver question here is the distinction between a Rule 59(b) request for a "new trial," meaning a "re-examination of an issue of fact" and a request under Rule 52(b) and 59(j) for amended findings, both of which ask the court to change its mind on a finding of fact. A "new trial" is generally understood to be a "wholly new trial … unfettered by the rulings, pro or con,

1

made at the first trial, and with the right to have new rulings on evidence...." 58 Am. Jur. 2d *New Trial* § 1.

[¶4]   Under N.D.R.Civ.P. 59(j), a party may move to amend a judgment, which requests a court to "reconsider its judgment and correct errors of law." *Flaten v. Couture*, 2018 ND 136, ¶ 28, 912 N.W.2d 330 (citing *Tuhy v. Tuhy*, 2018 ND 53, ¶ 20, 907 N.W.2d 351); *see generally* 47 Am. Jur. 2d *Judgments* § 636. When a party moves under N.D.R.Civ.P. 59(j) to alter or amend a judgment, it is not limited in its appeal to a review of the grounds the party presented in its motion to the trial court, unlike when a party moves under N.D.R.Civ.P. 59(b) for a new trial. *In re N.C.C.*, 2000 ND 129, ¶ 12, 612 N.W.2d 561. The distinguishing factor between these two motions is that "[u]nlike a N.D.R.Civ.P. 59(b) motion for a new trial, a N.D.R.Civ.P. 59(j) motion to alter or amend a judgment does not usually request a reexamination of issues of fact." *Id*. "Rather, a motion to alter or amend 'may be used to ask the court to reconsider its judgment and correct errors of law.'" *Id*.

[¶5]   A court may also correct a "clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record" under N.D.R.Civ.P. 60(a). Application of N.D.R.Civ.P. 60(a) is appropriate when the movant claims one of the following occurred: a "clerical mistake, oversight, or omission in the judgment or amended judgment." *McWethy v. McWethy*, 366 N.W.2d 796, 799 (N.D. 1985). Under N.D.R.Civ.P. 60(b)(1), a court may relieve a party from a "mistake, inadvertence, surprise, or excusable neglect."

[¶6]   The motion in question was simply titled "motion." Neither the motion nor the brief in support requested a "new trial" or cited N.D.R.Civ.P. 59(b). Each of the four citations to Rule 59 in the brief was specifically to N.D.R.Civ.P. 59(j), which provides for motions "to alter or amend a judgment." In the body of the motion, Jeffrey Edison stated he "moves the Court for an amending the findings and/or Judgment entered June 24, 2022, or for relief from Judgment." To inform the adversary of the nature of the motion and the relief sought, a movant has the burden to accurately label a motion. *N.C.C.*, 2000 ND 129, ¶ 11.

On appeal we "may look to the substance of the motion to determine its proper classification." *Id.*; *see also Flaten*, 2018 ND 136, ¶ 39.

[¶7]   Jeffrey Edison's motion sought the following relief:

   a. Correcting the error of awarding Signe the property in items 26, 27, 29, 31, 101, and 102 in Exhibit A attached to the Judgment;
   b. Including a vacation schedule as required by N.D.C.C. 14-09-30(2)(d)(1);
   c. Correcting the error of having Memorial Day and Labor Day holidays end on the night prior to the holidays.
   d. Imposing a proximity restriction on Signe.
   e. Correcting Jeff's child support obligation.

Each request asked the court to amend the findings or judgment or correct what Jeffrey Edison asserted were errors or omissions in the judgment. *See McWethy*, 366 N.W.2d at 799. Nowhere does he expressly request a "new trial" or "a re-examination of an issue of fact," which would invoke the language of the definition of "new trial." Each request for relief sought correction of a purported error or omission. *Van Sickle v. Hallmark & Assocs., Inc.*, 2013 ND 218, ¶ 18, 840 N.W.2d 92; *N.C.C.*, 2000 ND 129, ¶ 12; *McWethy*, 366 N.W.2d at 799.

[¶8]   The substance of the motion and Jeffrey Edison's argument to the district court invoked the court's authority under N.D.R.Civ.P. 52(b), 59(j), 60(a), and 60(b)(1) but not N.D.R.Civ.P. 59(b). Jeffrey Edison is not limited on appeal to the arguments he made in the motion. Therefore, he did not waive his gender bias argument, and we will now consider the merits of his argument.

II

[¶9]   Jeffrey Edison argues that the district court erred in awarding Signe Edison primary residential responsibility on the basis of gender bias. We have explained the standard of review for a trial court's award of primary residential responsibility.

   [The district] court's award of primary residential responsibility is a finding of fact, which will not be reversed on appeal unless it is

3

clearly erroneous or it is not sufficiently specific to show the factual basis for the decision. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or, although there is some evidence to support it, on the entire record, we are left with a definite and firm conviction a mistake has been made. Under the clearly erroneous standard, we do not reweigh the evidence nor reassess the credibility of witnesses, and we will not retry a custody case or substitute our judgment for a district court's initial custody decision merely because we might have reached a different result. The district court has substantial discretion in making a custody determination, but it must consider all of the best-interest factors. Although a separate finding is not required for each statutory factor, the court's findings must contain sufficient specificity to show the factual basis for the custody decision.

*Rustad v. Baumgartner*, 2018 ND 268, ¶ 4, 920 N.W.2d 465 (quoting *Zuraff v. Reiger*, 2018 ND 143, ¶ 11, 911 N.W.2d 887).

[¶10] This Court has explained the standard for custody determinations at the district court.

In an initial custody decision, the trial court must award custody of the child to the person who will better promote the best interests and welfare of the child. Neither the fitness of the parents nor fairness to the parents is the appropriate test for determining custody, but rather the predominant consideration is the best interests of the child.

*Klein v. Larson*, 2006 ND 236, ¶ 7, 724 N.W.2d 565 (cleaned up). "For the purpose of parental rights and responsibilities," a district court determines the best interests of a child by considering the factors found in section 14-09-06.2(1), N.D.C.C. *See also Rustad v. Rustad*, 2014 ND 148, ¶ 9, 849 N.W.2d 607 (stating that a court must consider all of the relevant factors under N.D.C.C. § 14-09-06.2(1)).

[¶11] North Dakota law broadly prohibits discrimination on the basis of sex. N.D.C.C. § 14-02.4-01. When determining primary residential responsibility "[b]etween the mother and father, whether married or unmarried, there is no

presumption as to whom will better promote the best interests and welfare of the child." N.D.C.C. § 14-09-29(1). The tender years doctrine, which held that "children of 'tender years,' regardless of their gender, belong with their mother," was long ago replaced with a principle of neutrality between mothers and fathers. *Rustad*, 2014 ND 148, ¶ 12 ("There is no gender bias in deciding issues related to parental rights and responsibilities regardless of the child's age."); *see also McDowell v. McDowell*, 2003 ND 174, ¶ 19, 670 N.W.2d 876; *Leppert v. Leppert*, 519 N.W.2d 287, 292 (N.D. 1994).

[¶12] We have previously considered and rejected arguments relying on stereotypes and generalizations about mothers and fathers. *Kasprowicz v. Kasprowicz*, 1998 ND 68, ¶ 14, 575 N.W.2d 921. In *Kasprowicz*, the mother argued: "the entire evolution of human biology and the record of human history to date, supports the concept that the natural mother should be the primary custodian of a small child, unless there are extraordinary circumstances." *Id.* We rejected this as "outmoded," "discredited," and employing "a form of gender bias." *Id.* (applying predecessor statute repealed in 2009 which provided "husband and father and wife and mother have equal rights with regard to the care, custody, education, and control of the children of the marriage").

[¶13] We have said any reliance by a district court on "sex-based rules that are … based on sexual stereotypes" is "troubling." *Rustad*, 2014 ND 148, ¶ 12. In *Rustad*, the court made a single statement among extensive discussion of the best interest factors that a mother was "more aware of her daughter's needs, and is in a better position to explain a female's needs." *Id.* We affirmed because the findings as a whole showed the statement was not a significant basis for the court's decision. *Id.* at ¶¶ 12-17.

[¶14] In *Rustad v. Baumgartner*, 2020 ND 126, 943 N.W.2d 786, we affirmed a restriction on the father's overnight parenting time with two young children. Because it appeared the mother's decision to breastfeed may have been a factor, Justice McEvers wrote separately to emphasize there should be "no gender bias in deciding issues relating to parenting rights," and a mother cannot "undermine the father's parenting time by choosing to breastfeed." *Id.*

5

at ¶¶ 13-14 (citing *Rustad*, 2014 ND 148, ¶ 12) (McEvers, J., concurring specially).

[¶15] Here, the district court analyzed the best interests of the children under N.D.C.C. § 14-09-06.2(1)(a)-(m) and found three factors—(a), (c), and (m)—favored Signe Edison regarding E.E., and two factors, (c) and (m), favored her regarding H.J.E. The court found that all other factors were neutral.

[¶16] Under factor (a), the district court found, regarding love and emotional ties, there was no distinction between the parents for H.J.E., who was no longer breastfeeding. But the court found that there were "stronger emotional ties" between E.E., a newborn, and Signe Edison because of breastfeeding. The court found, "The bond between a breastfeeding mother and a newborn is likely as strong a bond as can be established between two human beings. This is no fault of Jeffrey's. Rather, it is an inescapable biological reality." The court also found the children's interests would be better served by Signe Edison's superior ability to guide, due to her education and experience.

[¶17] Regarding (c), the court found Signe Edison could better meet the children's developmental needs because of her education and experience as a trained elementary school teacher. Next, regarding E.E., the infant, the court found that (c) favored Signe Edison because she breastfed, which is more beneficial over formula for E.E.'s immune system and increases E.E.'s and Signe Edison's emotional bond. The court mentioned pumping breast milk "as a short-term substitute to natural feeding" but rejected pumping based on testimony that it would stimulate less production. The court found: "Only Signe is capable of breast-feeding.... These biological realities are unavoidable and must be strongly considered by the Court."

[¶18] The district court weighed factor (m), "[a]ny other factors," in favor of Signe Edison. Regarding E.E., the court took account of the fact that Signe Edison continues to breastfeed, which the court weighed in favor of her because of both practical and emotional considerations. The court wrote, "Yes, women are able to use mechanical pumps to help supply the child's needs. However, a pump approach bypasses the psychological and emotional benefits of at-the-breast feeding. Moreover, natural feeding encourages production, while

6

mechanical pumps do not encourage production as well as natural feeding." The court also found that joint residential responsibility would be adverse to the children's best interests because it would cause discord and further litigation. The fact that E.E. was still breastfeeding, the court found, also made joint residential responsibility adverse to E.E.'s best interests.

[¶19] We conclude these findings regarding E.E.'s best interests are clearly erroneous because they misapply N.D.C.C. § 14-09-29(1). The court's reasoning for awarding Signe Edison primary residential responsibility over E.E. depended significantly on Signe's breastfeeding E.E. The court wrote, "The Court's ultimate decision endeavors to be respectful to, and accommodate, Signe's feeding of E.E., and its benefits to her. This weighs heavily in favor of Signe." The court found that its award "should not be understood to be a criticism of Jeffrey's parenting abilities or desire. Rather the Court is confronted with a biological reality that E.E. is a breast-feeding infant in the midst of an unprecedented formula shortage."

[¶20] These findings are strikingly similar to the "outmoded," "discredited," and gender-biased argument rejected in *Kasprowicz*. 1998 ND 68, ¶ 14. Unlike *Rustad v. Baumgartner,* where breastfeeding *may* have been a factor, and unlike *Rustad v. Rustad*, where a single, gender-biased comment by the court was insignificant, here the significance of breastfeeding was repeatedly emphasized by the court. The district court found that E.E. had a loving relationship with both parents but had stronger emotional ties with Signe Edison as a result of breastfeeding. The finding is based on no other facts or evidence. The court's reasoning assumed that a mother is better suited to care for an infant and able to have a deeper bond solely as a result of her ability to breastfeed. The assumption that by breastfeeding, a mother necessarily has a deeper bond with a child compared to the father raises an appearance of bias on the basis of sex. This reasoning is inconsistent with N.D.C.C. § 14-09-29(1).

[¶21] Our recognition that the law requires equal treatment of fathers and mothers does not deny that there may be differences between mothers and fathers at the group level. The law requires specific findings about the individual parents, not application of generalizations about what may be

7

generally true of men and women. To illustrate, the court's findings would have been similarly erroneous if it had reasoned that because, as a group, men generally have superior physical strength compared to women, the father would better provide a safe environment under factor (b), N.D.C.C. § 14-09-06.2(1). The prohibited reasoning runs like this: (1) a woman is more likely than a man to have a particular positive characteristic relating to a best interest factor; (2) this parent is a woman; (3) therefore the best interest factor weighs in favor of this parent because she is a woman.

[¶22] Our dissenting colleagues are "concern[ed] that the district court made some findings that appear to be based generally on breastfeeding women and their babies," but point to evidence in the record that, absent the reliance on generalizations about women, may support the ultimate finding on primary residential responsibility. Here, the district court's reasoning relies significantly on generalizations about differences between mothers and fathers. Thus, its finding on primary residential responsibility is clearly erroneous because it was induced by an erroneous view of the law. As an appellate court, we do not attempt to excise improper factors from proper factors, reweigh evidence, or speculate whether the district court would have reached the same finding without the improper factors weighing on one side of the balance. *Dalin v. Dalin*, 512 N.W.2d 685, 689 (N.D. 1994) (reasoning that generalizations about fathers as a group "would be relying on an improper factor to determine custody"); *Klein v. Larson*, 2006 ND 236, ¶¶ 20-22, 724 N.W.2d 565 (reversing for clear error where district court applied erroneous interpretation of best interest factor); *Thatcher v. Hanover Ins. Grp., Inc.*, 659 F.3d 1212, 1213 (8th Cir. 2011) (stating that a court abuses its discretion "when an irrelevant or improper factor is considered and given significant weight").

[¶23] The district court's findings in support of its award of primary residential responsibility to Signe Edison were heavily influenced by improper sex-based generalizations. We conclude the court's decision to award Signe Edison with primary residential responsibility, with respect to both children, was clearly erroneous. We remand for the district court to make findings under a correct application of the law. *O'Hara v. Schneider*, 2017 ND 53, ¶¶ 28-29, 890 N.W.2d 831 (remanding for findings under correct interpretation of the best interests

8

factors); *see also Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 2000 ND 15, ¶ 31, 605 N.W.2d 153 (remanding for findings on class certification where district court misapplied the law on two factors, despite observation that "[m]ost of the court's findings are affirmable"); *Klein*, 2006 ND 236, ¶¶ 33-36 (Crothers, J., concurring in part and dissenting in part) ("A misapplication of law generally warrants reversal of the judgment and remand so the district court can apply relevant facts to the law as clarified by this Court.").

## III

[¶24] Jeffrey Edison argues this Court should not only reverse, but also award the parties equal residential responsibility and impose a 50/50 parenting plan. In *Law v. Whittet*, this Court reversed the district court award of joint residential responsibility and awarded Law primary residential responsibility, but it remanded and directed the district court to set "an appropriate parenting time." 2014 ND 69, ¶ 23, 844 N.W.2d 885. Whether an appellate court should make such awards has divided this Court. *See id.* at ¶ 28 (Crothers, J., specially concurring) (citing *Klein v. Larson*, 2006 ND 236, ¶¶ 33-36 (Crothers, J., concurring in part and dissenting in part)). When considering a matter under our appellate jurisdiction, we do not engage in fact finding. That role is for the district court. "District courts are in a superior position to assess credibility of witnesses and weigh evidence." *State v. Boehm*, 2014 ND 154, ¶ 9, 849 N.W.2d 239 (citing *State v. DeCoteau*, 1999 ND 77, ¶ 6, 592 N.W.2d 579). "Under the clearly erroneous standard, we do not reweigh the evidence nor reassess the credibility of witnesses, and we will not retry a custody case or substitute our judgment for a district court's initial custody decision merely because we might have reached a different result." *Rustad*, 2018 ND 268, ¶ 4. We leave this task for the district court on remand.

[¶25] Jeffrey Edison also requests that this Court reassign this case to a different district court judge on remand. "The purpose of reassignment is, in part, to preserve the integrity of the court, to protect litigants from bias, and to ensure that allegations of prejudice do not affect fair administration of the law." *T.F. James Co. v. Vakoch*, 2001 ND 112, ¶ 18, 628 N.W.2d 298. This Court weighs several "competing interests" when deciding whether to remove a district court judge from a case. *Id.* at ¶ 19. This Court retained a judge where

9

a record was voluminous and there had been an exceptional number of proceedings, where having experience working on the case was beneficial, where the trial judge may have been confused about the law, and where the allegations of bias were of "subconscious bias" rather than "actual bias." *Id*. On the other hand, "when there is an allegation of prejudice presented to this court, we favor granting the change of judge in a situation where the judge would be presiding at the trial on the merits." *Blomquist v. Clague*, 290 N.W.2d 235, 240 (N.D. 1980) (quotations omitted); *United Hosp. v. Hagen*, 285 N.W.2d 586, 589 (N.D. 1979); *see also Slaubaugh v. Slaubaugh*, 466 N.W.2d 573, 583 (N.D. 1991) ("*Blomquist* and *Hagen* suggest that we apply a stricter standard when allegations of prejudice are made against a judge who will try the case without a jury upon retrial.").

[¶26] *Blomquist and Hagen* are distinguishable from this case. In *Blomquist*, the judge denied Blomquist's writ of mandamus without holding an evidentiary hearing, which we concluded was required under the circumstances. 290 N.W.2d at 237-38. Without agreeing there was "any substance to the allegations of prejudice," we directed another judge to preside at the evidentiary hearing on remand. *Id*. at 240. In *Hagen*, the judge denied Hagen's demand for a jury trial. 285 N.W.2d at 587. We wrote "when there is an allegation of prejudice presented to this Court we favor granting the change of judge *when the judge has denied the demand for a jury trial* and would then be presiding at the trial on the merits." *Id*. at 589 (emphasis added). Jeffrey Edison has not demonstrated the judge denied him an evidentiary hearing or trial as the judges did in *Blomquist* and *Hagen*.

[¶27] Although mentioned in a concurrence, this Court has never directly addressed the extent to which the required neutrality between mothers and fathers may limit a court's consideration of breastfeeding when determining parental responsibility. *See Rustad v. Baumgartner*, 2020 ND 126, ¶¶ 13-14, 943 N.W.2d 786 (McEvers, J., concurring) (stating, "I do not want this opinion to send the signal that the mother can undermine the father's parenting time by choosing to breastfeed[,]" and noting, "[t]here should be no gender bias in deciding issues relating to parenting rights and responsibilities regardless of the children's age").

[¶28] The factors found in *T.F. James* favor retention of the district court judge, and the facts in that case are similar to the case before us today. 2001 ND 112, ¶ 19. In *T.F. James*, the district court "misinterpreted this Court's opinion" or "may have been confused by the conciliatory language of our earlier opinion." 2001 ND 112, ¶¶ 14, 20. Under those facts, we declined to assign a different judge, explaining our new opinion "provide[s] explicit direction to the district court. On balance, the trial judge's familiarity with the case, our explicit instructions, and the 'subconscious' nature of any alleged bias favor retention rather than reassignment." *Id.* at ¶ 20. We have declined to reassign a case to a different judge on remand when the judge's initial decision was based on a misapplication of the law. *See Dietz v. Dietz*, 2007 ND 84, ¶ 24, 733 N.W.2d 225. Today we clarify the law to be applied on remand. Nothing in the record indicates the judge cannot appropriately apply this decision on remand.

[¶29] "Determining whether or not to assign a different judge requires delicate balancing of numerous competing interests." *T.F. James*, 2001 ND 112, ¶ 19. One factor we consider when determining whether to assign a different judge on remand is the extent of the proceedings below and the judge's familiarity with them. *Id.* The assigned judge has presided over this case since February 2021. During that time, he addressed several motions and entered numerous orders, including an Interim Order, a Supplemental Interim Order, an Amended Supplemental Interim Order, a Second Amended Supplemental Interim Order, and a Third Amended Supplemental Interim Order. He also presided over a three-day trial, addressed post-trial motions, and entered Findings of Fact, Conclusions of Law, and Order for Entry of Judgment and Findings of Fact, Conclusions of Law, and Amended Order for Entry of Judgment. Having presided throughout the course of the proceedings, "the district court judge has particular insight that cannot be replicated by a replacement." *Id.* The judge's knowledge of and insight regarding the case and parties will be lost if a new judge is assigned. For example, on remand the assigned judge can address the issues on the record, having presided over the entirety of this proceeding, including the three-day trial. A newly assigned judge may have to hold a second trial to hear and determine witness credibility and other issues. *See State v. Nakvinda*, 2011 ND 217, ¶ 25, 807 N.W.2d 204 ("When judging the credibility of witnesses, reading a cold transcript is no

substitute for hearing and observing witnesses as they testify." (cleaned up)); N.D.R.Civ.P. 63 (placing duty on replacement judge to certify familiarity with the record and determine the case may be completed without prejudice to the parties). It is not in the interest of the children or either parent to delay this matter so a second trial can be held.

[¶30] Retention of the district court judge is warranted because the district court judge has experience with the record and simply misapplied the law, and Jeffrey Edison has not demonstrated bias by the judge.

IV

[¶31] Jeffrey Edison argues that Signe Edison's brief and the amicus curiae brief cite to facts and authorities that are not part of the record in the district court. He argues we must ignore them on appeal under N.D.R.App.P. 10(a). We agree in part and disagree in part.

[¶32] The authorities that Jeffrey Edison argues we must disregard include treatises published by John Locke and Sir William Blackstone, a law review article, a report by the Surgeon General, a report by the U.S. Department of Health and Human Services, and several articles published in medical journals.

[¶33] A record is composed of the following:

> **(a) Composition of Record on Appeal.** The following items constitute the record on appeal:
> (1) the documents and exhibits filed in the district court, including the notice of appeal as filed in Odyssey by the clerk of the supreme court;
> (2) an electronic copy of the transcript in portable document format (PDF), if any; and
> (3) certification prepared by the clerk of district court stating what constitutes the record filed in the district court.

N.D.R.App.P. 10(a). A trial court may take judicial notice of adjudicative facts that are not in the record. N.D.R.Ev. 201(a). A court may take judicial notice if a fact "is not subject to reasonable dispute because it … can be accurately and

readily determined from sources whose accuracy cannot reasonably be questioned." N.D.R.Ev. 201(b)(2). On appeal, we have discretion to take judicial notice when such a request was not made in the trial court. *Senske Rentals, LLC v. City of Grand Forks*, 2023 ND 55, ¶ 7, 988 N.W.2d 598 (citing *Workforce Safety & Ins. v. Oden*, 2020 ND 243, ¶ 56, 951 N.W.2d 187). We have generally declined to consider evidence that was not part of the trial court's record. *Hillerson v. Bismarck Pub. Sch.*, 2013 ND 193, ¶ 9, 840 N.W.2d 65; *Interest of R.H.*, 262 N.W.2d 719, 722 (N.D. 1978).

[¶34] This Court frequently considers legal authority identified during its own research—we are not limited to the arguments or authorities cited by the parties. *State v. Holecek*, 545 N.W.2d 800, 804 (N.D. 1996) (stating it is "not only our authority, but our duty to decide the applicability of relevant statutes to legal controversies whether or not the parties have pointed us to them or argued a particular construction"). On appeal, we encourage parties to cite pertinent legal authority, whether or not cited to the district court. Usually, legal authorities cited to a court are legislative facts that fall outside the scope of N.D.R.Ev. 201. *City of Bismarck v. McCormick*, 2012 ND 53, ¶ 12, 813 N.W.2d 599 (explaining the difference between judicial notice of "adjudicative facts" subject to proof by formal introduction of evidence and "legislative facts" that aid in the interpretation and application of law and may be freely noticed outside the procedure required by N.D.R.Ev. 201). We may decline review of new issues on appeal, but we do not reject consideration of newly identified legal authority relating to issues preserved for appeal. The citations to Locke, Blackstone, and the law review articles are appropriate in support of legislative facts, and we reject the argument that we may not consider them on appeal.

[¶35] In contrast, government reports and medical journals, to the extent offered to support or oppose factual determinations by the district court, are matters that should be presented to the district court in the first instance. We will not judicially notice or give any consideration to these cited references.

13

V

[¶36] Jeffrey Edison argues the district court erred in finding that he was underemployed for purposes of child support and for imputing income to him. We agree.

[¶37] We apply a mixed standard of review for child support determinations: "Child support determinations involve questions of law which are subject to the de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and may, in some limited areas, be matters of discretion subject to the abuse of discretion standard of review." *Grossman v. Lerud*, 2014 ND 235, ¶ 6, 857 N.W.2d 92 (citing *State ex rel. K.B. v. Bauer*, 2009 ND 45, ¶ 8, 763 N.W.2d 462). "Determination of whether an individual is underemployed is within the discretion of the trial court." *Schrodt v. Schrodt*, 2022 ND 64, ¶ 22, 971 N.W.2d 861. "If the district court fails to comply with the child support guidelines in determining an obligor's child support obligation, the court errs as a matter of law." *Grossman*, at ¶ 6 (citing *Serr v. Serr*, 2008 ND 56, ¶ 18, 746 N.W.2d 416).

[¶38] "Courts may deviate from the guideline amount when a party urging deviation shows, by a preponderance of the evidence, that deviation is appropriate. However, when courts deviate from the guidelines, that deviation must be supported by specific findings that the presumption under the guidelines has been rebutted." *Bye v. Robinette*, 2015 ND 276, ¶ 4, 871 N.W.2d 432 (cleaned up).

A

[¶39] Jeffrey Edison first argues the court erred because it failed to compare his gross income to the statewide average earnings for persons with similar work history and occupational qualifications as required under N.D. Admin. Code § 75-02-04.1-07(1)(b). Courts must impute income to an obligor who is unemployed or underemployed unless an exception applies. N.D. Admin. Code § 75-02-04.1-07(3). The district court stated at a post-judgment motion hearing that it did not need to rely on N.D. Admin. Code § 75-02-04.1-07(2) to find that Jeffrey Edison was underemployed, and the court therefore found that he was

14

underemployed under N.D. Admin. Code § 75-02-04.1-07(1)(b). "An obligor is 'underemployed' if the obligor's gross income from earnings is significantly less than this state's statewide average earnings for persons with similar work history and occupational qualifications." N.D. Admin. Code § 75-02-04.1-07(1)(b).

[¶40] A district court erred because it did not "provide a source for the amount of earnings that someone with [the obligor's] qualifications earns." *Bye*, 2015 ND 276, ¶ 6. "Both N.D. Admin. Code §§ 75-02-04.1-07(1)(b) and 75-02-04.1-07(2) require the use of 'this state's statewide average earnings.'" *Schrodt*, 2022 ND 64, ¶ 24. District courts must refer to a source demonstrating the average earnings for the entire state of North Dakota; evidence of average earnings for a different geographic area is insufficient. *Schurmann v. Schurmann*, 2016 ND 69, ¶¶ 21, 22, 877 N.W.2d 20. The statewide average earning reports published by Job Service of North Dakota are sufficient. *Schrodt*, at ¶ 24; *see also Verhey v. McKenzie*, 2009 ND 35, ¶ 13, 763 N.W.2d 113 (citing *Orvedal v. Orvedal*, 2003 ND 145, ¶ 12, 669 N.W.2d 89).

[¶41] Here, the district court did not compare Jeffrey Edison's income to a published study of the statewide average earning but compared it to the expected income of a carpenter in Fargo, North Dakota, on the basis of witness testimony. It also found that Jeffrey Edison was underemployed because he testified that he could draw a larger salary from his business but took a smaller salary because he wanted to keep more money in the business. Signe Edison agrees that "neither party presented evidence of North Dakota's statewide average earnings for construction workers, construction managers, or contractors." She argues, however, that this "failure is on the parties, not the court." The failure is on the parties, but the court misapplied N.D. Admin. Code § 75-02-04.1-07(1)(b). The court's finding that Jeffrey Edison was underemployed is clearly erroneous because it lacked evidence to support the "statewide average earnings for persons with similar work history and occupational qualifications."

## B

[¶42] Jeffrey Edison next argues that the district court erred in finding that he was underemployed because the court considered his adjusted gross income rather than his gross income. "An obligor is 'underemployed' if the obligor's gross income from earnings is significantly less than this state's statewide average earnings for persons with similar work history and occupational qualifications." N.D. Admin. Code § 75-02-04.1-07(1)(b). "Income must be sufficiently documented through the use of tax returns, current wage statements, and other information to fully apprise the court of all gross income." N.D. Admin. Code § 75-02-04.1-02(7).

[¶43] "Adjusted gross income" is distinct from "gross income." Section 75-02-04.1-01(4)(a)-(b), N.D. Admin. Code, defines gross income as "income from any source, in any form" and in (4)(a) lists sources that are not gross income and in (4)(b) lists, non-exclusively, examples of sources that are gross income. "Adjusted gross income" is not mentioned, and the North Dakota Administrative Code uses the terms distinctly. N.D. Admin. Code § 75-02-04.1-01(4)(b), (6)(a)-(i). The internal revenue code defines "adjusted gross income" as "in the case of an individual, gross income minus the following deductions," and then lists several deductions. 26 U.S.C. § 62.

[¶44] A district court may consider adjusted gross income to determine the gross income. *Schrodt*, 2022 ND 64, ¶ 23. However, a court fails to comply with the guidelines when it concludes, on the basis of adjusted gross income and without determining gross income, that a person is underemployed. *Halberg v. Halberg*, 2010 ND 20, ¶¶ 14-18, 777 N.W.2d 872. In short, the court must make a finding of gross income. *Id*. Here, as in *Halberg*, the court erred because it failed to calculate Jeffrey Edison's gross income and made a determination solely on the basis of his adjusted gross income from his tax returns.

16

[¶45] We reverse the judgment and amended judgment and remand for proceedings consistent with this opinion.

[¶46] Jon J. Jensen, C.J.
  Daniel J. Crothers
  Jerod E. Tufte

**McEvers, Justice, concurring in part and dissenting in part.**

[¶47] I concur with parts I, IV, V, and much of part III, but I respectfully dissent to part II. I disagree that remand is necessary on the issue of primary residential responsibility.

[¶48] As to part II of the opinion, I would affirm based on the standard of review. "Our review of a district court's decision on primary residential responsibility is limited. 'A district court's decisions on primary residential responsibility are treated as findings of fact and will not be set aside on appeal unless clearly erroneous.'" *Lessard v. Johnson,* 2019 ND 301, ¶ 12, 936 N.W.2d 528 (cleaned up). Under this standard of review, we do not reweigh the evidence or reassess the credibility of witnesses, and we will not substitute our judgement for a district court's decision merely because we might have reached a different result. *Id.* "A choice between two permissible views of the weight of the evidence is not clearly erroneous, and our deferential review is especially applicable for a difficult child custody decision involving two fit parents." *Fleck v. Fleck,* 2010 ND 24, ¶ 7, 778 N.W.2d 572 (quoting *Jelsing v. Peterson,* 2007 ND 41, ¶ 11, 729 N.W.2d 157) (citations omitted). "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence supports it, or if, after reviewing the entire record, we are left with a definite and firm conviction a mistake has been made." *Goetz v. Goetz,* 2023 ND 120, ¶ 5, --- N.W.2d ---.

[¶49] After a review of the record and the district court's findings, I disagree with the majority that the court's decision on primary residential responsibility

is clearly erroneous. Although I join the majority's concern that the district court made some findings that appear to be based generally on breastfeeding women and their babies, the bulk of the findings are specific to these parties and the best interests of their children. The district court is not alone in expressing some generalities. This Court has made statements that could be construed as stereotypes in affirming what is in the best interests of a child:

> Of course, the repeal of the statute setting forth the "tender years" doctrine does not alter the observed fact that mothers of infants are most often better able to care for them than the fathers are. But that fact is only one of the many considerations to be weighed by the trial court in making its finding as to the best interest of the child, and to be considered by us in determining whether the finding was clearly erroneous. Under the circumstances here, we cannot say that the finding was clearly erroneous. It is possible that we might have made a different determination if we had tried the case in the first instance, but we did not.

*Odegard v. Odegard*, 259 N.W.2d 484, 486 (N.D. 1977). The record here contains evidence to support the court's findings that it was in the best interests of the children that Signe Edison should have primary residential responsibility of the children.

[¶50] Jeffrey Edison's argument on appeal is that the district court based its custodial determination *solely* on gender. The court's 43-page order included 9 pages of findings addressing *each* of the best interest factors. The court included analysis of many factors other than gender in reaching its decision. The court found many positive qualities in both parents, and the majority of the factors favored neither party; however, none of the best interest factors favored Jeffrey Edison. The court focused on specific experience, qualities, and traits of each parent, but found Signe Edison possessed more qualities that show her having primary residential responsibility is in the children's best interests.

[¶51] I agree with the majority that North Dakota law broadly prohibits discrimination on the basis of sex. Majority, at ¶ 11 (relying on a policy provision of the North Dakota Human Rights Act). However, I see nothing in

the Human Rights Act that prohibits a court from considering breastfeeding when determining the best interests of a child. I also agree there is no presumption between a mother and a father who will promote the best interests and welfare of a child under N.D.C.C. § 14-09-29. Under N.D.C.C. § 14-09-29, a court must award parental rights and responsibilities to the person who will, in the opinion of the court, promote the best interests of the child. Breastfeeding may or may not be in the best interests of a child and, in general, either parent may be able to provide the child with breast milk from a bottle, either from the mother or a secondary source. The State of Hawai'i has seen fit to include breastfeeding as a factor to be considered when creating parenting plans. HI ST § 571-46.5(c)(4).

[¶52] The majority opinion gives short shrift to the district court's findings under factor (a) regarding Signe Edison's particular strengths unrelated to breastfeeding. Majority, at ¶ 16. Under factor (a), the court considers: "The love, affection, and other emotional ties existing between the parents and child and the ability of each parent to provide the child with nurture, love, affection, and guidance." N.D.C.C. § 14-09-06.2(1)(a). The district court found:

> "Guidance" is one of Signe's particular strengths. By both education and experience, she is especially aware of how to relate to a child in his or her developmental moment and guide them appropriately. On this topic, the Court is fully convinced of Jeffrey's good intentions. However, Signe has specific training in this regard and has demonstrated her ability to be a fantastic mother.

> This factor is largely favorable to both parties, who can be commended for their true love and commitment to their children. However, with respect to her relationship with E.E. and her strengths in the area of "guidance," it favors Signe.

These findings are supported by the record through the testimony of Signe Edison and Dr. Krislea Wegner, who conducted a parental capacity evaluation on Signe.

[¶53] Regarding factor (c), the majority opinion also does not consider the totality of the district court's findings. Majority, at ¶ 17. Under factor (c), the

19

court considers: "The child's developmental needs and the ability of each parent to meet those needs, both in the present and in the future." N.D.C.C. § 14-09-06.2(1)(c). The court's findings on factor (c) focused on many important factors other than breastfeeding, such as:

> Signe has degrees in Human Development and Family Science and Elementary Education. Her degrees relate to how children develop, and how individuals and families develop, interact, and grow. They relate to the promotion of positive development and the expansion of human development. She has applied her experience as a teacher for approximately eight years in a classroom setting and, after H.J.E.'s birth, at home.

> Being attuned to and aware of children's developmental needs, and meeting them, is Signe's signature strength, as was affirmed by Psychologist Krislea Wegner.

> In her testimony, Signe spoke to the attention she gives her children's development in the spheres of physical, cognitive, language, and social/emotional development. There is no reason to dispute her testimony in this regard.

> Signe is also breast-feeding E.E. This contributes to E.E.'s development in ways that formula cannot. It increases E.E.'s emotional bond with Signe. It strengthens E.E.'s immune system. The Court must also consider that there is a shortage of infant formula as of the date of this opinion and that the shortage is likely to continue for the foreseeable future. (www.hhs.gov/formula/index.html)

> Jeffrey is educated in construction management. Without diminishing his ability to parent or efforts to be the best father he can be, Signe is simply more skilled in this regard as a result of her training and experience.

> This factor favors Signe and weighs significantly in the Court's ultimate conclusion. The parties have both expressed a preference for breast-feeding. Only Signe is capable of breast-feeding. In addition, there is an uncertain supply of formula. Pumping may serve as a short term substitute to natural feeding, but it does not serve as a replacement. Signe testified credibly that, for her,

20

pumping does not encourage production of breast milk to the same extent that natural feeding does. These biological realities are unavoidable and must be strongly considered by the Court.

These findings, including the findings on the breastfeeding, are supported by the record. On cross-examination, Jeffrey Edison testified he agreed he wanted E.E. to be breastfed:

> Q: Okay. And you agree that it would be important for Signe to breastfeed this child like she did H.E.; right?
>
> A: I think breastfeeding is medically better for a child, yes.

In response to a question from the court, Jeffrey Edison further testified:

> THE WITNESS: Other options is – I do believe that breast milk is better for the child, so I have looked at options of buying it myself if she's unwilling or unable to produce it. Formula is another option that – I mean, lots of kids are fed on it, so.

Signe Edison testified that although she was pumping breast milk, she was not producing enough to provide Jeffrey Edison with sufficient breast milk for his proposed parenting time. She also testified that E.E. is a "lackadaisical" eater and she was concerned that E.E. could be confused by switching between breastfeeding and bottle feeding. Signe Edison also testified that she was concerned about feeding E.E. with formula because her family has allergies to milk products.

[¶54] The court also recognized in its findings a well-reported fact that there was an ongoing formula shortage. These findings, including those related to breastfeeding, relate to the best interests of E.E. The "biological realities" discussed by the court relate to realities of this case—Signe Edison's testimony on her experience with being unable to provide enough expressed breast milk and the formula shortage—not to women in general.

[¶55] Dr. Krislea Wegner, a psychologist who performed a parental capacity evaluation on Signe Edison, testified about the results of the testing completed:

21

A:      … Within the skills that were measured over the course of all of the testing, she scored in the above-average ranges within all subskills. So what that suggested that she had, you know, above-average ability to understand child development, to be able to offer opportunities for independence for development of autonomy, and then also ensuring that the disciplinary skills utilized were not physical forms of discipline; that there was, you know, a full range of interventions that she was able to offer that weren't punitive or negative in nature; the importance of teaching, morals, and values, and just having a positive attitude, in general, with regard to parenting and feeling a bond with her children.

Q:      Thank you. Doctor Wegner, did it surprise you at all that someone who'd spent her college years studying human development and teaching, and then spent years teaching children would show strength in her, as you say, quote, "Understanding of children's developmental capabilities"?

A:      No. That didn't surprise me.

Q:      In fact, you would expect someone with that kind of educational background to be, as you say, above-average in their understanding of children's developmental capabilities?

A:      Yes. It would have been a big red flag if those would have been in the ranges – in the lower numbers showing deficits.

Regarding bonding between parents and a child, Dr. Wegner on cross-examination testified:

A:      The bond. A parent forms a bond with the child. The child actually attaches to the parent. And parental bonding actually happens quite easily and readily.

Q:      So would there be no concern to you then if the child was placed – feeding issues aside – would there be no concern to you then if the child was placed in Ms. – Mr. Edison's care and Ms. Edison got to see the child, E., for one hour a day? That wouldn't be a cause of concern to you?

22

A: Well, it's a different set of variables because the child is already forming a primary attachment when there's been a pregnancy where the mother has carried the child and then delivered the child. They identify that individual as their primary caretaker, which is why you have to introduce the other caretaker as a gradual process to form that bond and attachment, and then have the time away from that primary caretaker occur on a gradual basis so that the child doesn't form any type of feared response or feel any – of abandonment. That's how children end up with, you know, mental health issues and attachment issues is if those things aren't done well.

The district court's findings on the bond and attachment already established between Signe Edison and E.E. are supported by the record and are valid best interest considerations. The court's findings on factor (c) are supported by the record and are not clearly erroneous.

[¶56] The district court also found factor (m) favored Signe Edison. Factor (m) allows the court to consider: "Any other factors considered by the court to be relevant to a particular parental rights and responsibilities dispute." N.D.C.C. § 14-09-06.2(1)(m). The court made extensive findings under factor (m), some of which discussed benefits of breastfeeding to E.E. In addition to the findings on breastfeeding, the court found there to be discord between the parties and that joint residential responsibility would not be in the best interests of the children. The court cited the difficulty the parties had even agreeing to Christmas visitation while the case was pending. The court was also concerned that if Jeffrey Edison was awarded primary residential responsibility, he would seek to move the children to Washington, which would likely result in more litigation and discord. The court considered the thriving sibling relationship and sought to encourage that relationship by making their situations as similar as possible. These are all relevant factors not pertaining to breastfeeding or gender that favor Signe Edison.

[¶57] As with the other factors, the district court's findings on factor (m) are supported by the record. Signe Edison testified regarding additional benefits of breastfeeding for the court to consider under factor (m):

23

Q:     Factor M is a catch-all. It says, "Any other factors considered by the Court to be relevant to a particular parental rights and responsibilities dispute." We don't know what our Judge may consider relevant, but I'm going to just suggest a few. Breastfeeding?

A:     I believe it's relevant.

Q:     Okay. And explain to us – first of all, your intents about breastfeeding E., and why you consider them important.

A:     I hope to breastfeed E. as long as I can. And I think it's important because, you know, through my schooling. And through birth and delivery, they always have a breastfeeding specialist there, and they talk about why and encourage breastfeeding. And the breastfeeding that – the milk that E. gets is specifically designed for E. and it changes as E.'s needs change. And if E. gets sick, the milk changes to give antibodies to E. And so, either if I come in contact with a sickness, or E. – it's a two-way street for the both of us and the antibodies – but it is specifically designed for E. to meet her needs as she's growing and as she's changing. And it helps build an immune system for E.

Q:     Is it your understanding that the social sciences and the medical sciences support the view that you've just expressed?

A:     Yes.

[¶58] The court received a declaration from Dr. Wegner, as well as articles into evidence provided by Dr. Wegner, which discussed child development at different ages, the effect of conflict between parents on children, the benefits of breastfeeding, and various other related topics. A guide entitled "Child-Focused Parenting Time Guide" created by the Minnesota Judicial Branch, and labeled "Exhibit E" in the record, contained the following information on breastfeeding:

Breastfeeding is a consideration when the parenting time schedule is created for an infant. Breastfeeding provides physical and emotional benefits to the child. Parenting time schedules can be revised as the child's feeding needs change. When exclusively

24

breastfed, a child will benefit from frequent parenting time with the other parent. Where both parents have been engaged in an ongoing caregiving routine with a child who is fed breast milk, the same caregiving arrangement can be continued into the future in the parenting time schedule to maintain stability for the child.

[¶59] Another article received in evidence, authored by Dr. Isabelle Fox, discussed the basic need for infants to have the trust and security from consistent care by their primary caregiver in a familiar setting. This article, along with the finding of discord between the parents, supports the court's finding under factor (m) that joint residential responsibility was not in the best interests of the children. The court's findings on factor (m) are not clearly erroneous.

[¶60] The majority concludes the district court's findings regarding E.E.'s best interests are clearly erroneous because they misapply N.D.C.C. § 14-09-29(1). Majority, at ¶ 19. I agree with the majority that N.D.C.C. § 14-09-29(1) does not allow a presumption between a mother and a father who will better promote the best interests and welfare of the child, but I disagree that the district court misapplied the law or created a presumption; rather, it weighed the best interest factors based on the evidence as presented, including evidence on the benefits of breastfeeding E.E. under the circumstances of this case. It is beyond dispute that a child's nutritional needs and specific nutrition options available to a certain child are considerations that may bear on a court's consideration of the child's best interests. However, breastfeeding will not always factor favorably in the best interest analysis. For example, if a child is failing to thrive because of feeding issues related to breastfeeding, this factor could weigh against breastfeeding in favor of bottle feeding. In instances where a mother has addiction issues or a baby has phenylketonuria (PKU baby), breastfeeding would be detrimental to the child. Put simply, breastfeeding may be an important consideration among the many best interest factors, and it is not error for the court to consider it along with the other factors.

[¶61] As to my separate in *Rustad v. Baumgartner*, 2020 ND 126, ¶¶ 12-15, 943 N.W.2d 786, I stand by my position. I concurred because the district court there made findings to support its decision when breastfeeding factored into

the court's decision to severely restrict a father's parenting time until the child was three years old. My admonition was not that breastfeeding cannot be considered, but was a reminder that courts should not default back to the "tender years" doctrine that young children, regardless of their gender, belong with the mother. My continuing concern is that breastfeeding should not create a "trump" card, which in effect would create a presumption that breastfeeding women should be awarded primary residential responsibility or should completely defeat the other parent's opportunity for generous parenting time.

[¶62] I do not agree with the majority that the court's award of primary residential responsibility here was "heavily influenced" by improper sex-based generalizations. Majority, at ¶ 22. Rather, the court was faced with a difficult decision involving two fit parents and based its decision on the few distinguishing factors between the parties from the evidence presented. For example, in another case involving a close call, this court said the district court did not misapply the law when it found the factor that tipped the scales was the parent who was the child's "closest, nurturing parent." *Jelsing*, 2007 ND 41, ¶¶ 12-14. North Dakota has no presumption for either parent to receive primary residential responsibility, but it also has no presumption that joint parenting is in the best interests of the children.

[¶63] Particularly when the record shows there was agreement between the parties that breastfeeding is in the best interests of the child, as was the case here, it is not error or bias for the district court to take breastfeeding, and whether enough breast milk can be produced, into consideration along with other factors when making its custody determination. It is relevant here that the court's decision, and its findings concerning breastfeeding, were made during a nationwide infant formula shortage. Ensuring a child will be able to be nurtured and provided proper nutrition is a valid consideration when deciding the best interests of the child. The specific circumstances of this case, and the court's detailed findings concerning those circumstances, do not lead me to the conclusion that the court's decision was based on gender bias. The court's decision on primary residential responsibility between two fit parents is difficult, and this Court should not retry the case or substitute its judgement for that of the district court when its determination is supported by the

26

evidence. *Thompson v. Thompson*, 2018 ND 21, ¶ 8, 905 N.W.2d 772. The court cannot and should not create presumptions that the breastfeeding parent should automatically have custody; however, the court may consider the benefits of breastfeeding for the child when evidence in the record supports such a finding.

[¶64] Here, the district court made sufficient findings based on the evidence, admitted without objection, to support its decision. The court did not rely on the "tender years" doctrine or create a presumption that Signe Edison be awarded primary residential responsibility because she was breastfeeding. Rather, the court considered a number of factors, breastfeeding being only one of its many considerations. The court considered many specific traits and abilities possessed by Signe Edison and Jeffrey Edison, and ultimately found it was in the best interests of the children that Signe Edison have primary residential responsibility. The court did not misapply the law, its findings are supported by the record, and I do not have a definite and firm conviction a mistake has been made. I would affirm.

[¶65]  Lisa Fair McEvers
        Douglas A. Bahr

**Bahr, Justice, concurring in part and dissenting in part.**

[¶66] I concur in parts I, IV, and V of the majority opinion. I respectfully dissent to part II and join Justice McEvers' dissent to part II. I agree with the majority's analysis in part III but believe it is unnecessary because I would not conclude the district court's decision to award Signe Edison primary residential responsibility was clearly erroneous.

[¶67] As to part II of the majority opinion, I write separately to emphasize that I agree with the majority's statements of the law. I disagree with the majority's application of the law to the district court's specific factual findings in this case.

[¶68] As explained by the majority, courts may not rely "on stereotypes and generalizations about mothers and fathers" when determining residential

responsibility and parenting time. Majority, at ¶ 12. I further agree an "assumption that by breastfeeding, a mother necessarily has a deeper bond with a child compared to the father" would constitute a prohibited stereotype or generalization. *Id.* at ¶ 20. Rather, as explained by the majority, "[t]he law requires specific findings about the individual parents, not application of generalizations about what may be generally true of men and women." *Id.* at ¶ 21. However, based on a careful review of the district court's factual findings and the record, I disagree with the majority that the court "relies significantly on generalizations about differences between mothers and fathers." *Id.* at ¶ 22. Rather, I agree with Justice McEvers that, although the court "made some findings that appear to be based generally on breastfeeding women and their babies, the bulk of the findings are specific to these parties and the best interests of their children." McEvers, Justice, concurring and dissenting, at ¶ 49. Moreover, for the reasons articulated by Justice McEvers, the court's findings are not clearly erroneous, i.e., there is some evidence in the record to support them. *Otten v. Otten*, 2023 ND 134, ¶¶ 10-11 (stating "[a] district court's decisions on residential responsibility are treated as findings of fact and will not be set aside on appeal unless clearly erroneous," and that a finding of fact is clearly erroneous "if there is no evidence to support it").

[¶69] Based on my review, only two of the district court's findings are improper sex-based generalizations. They are the court's findings "[t]he bond between a breastfeeding mother and a newborn is likely as strong a bond as can be established between two human beings," and "women are able to use mechanical pumps to help supply the child's needs. However, a pump approach bypasses the psychological and emotional benefits of at-the-breast feeding." The court's other findings regarding breastfeeding are specific to the parties and the best interests of the children. They include: the parties have both expressed a preference for breastfeeding; Signe Edison is breastfeeding E.E., which contributes to E.E.'s development in ways that formula cannot, strengthens E.E.'s immune system, and increases E.E.'s emotional bond with Signe Edison; Signe Edison's pumping does not encourage production of breast milk to the same extent that natural feeding does; there is a shortage of infant formula that is likely to continue for the foreseeable future; and the fact Signe Edison is breastfeeding E.E. would lead to additional complications and

28

difficulties with joint responsibility that would not be in the best interests of the children.

[¶70] To support its position, the majority makes the following analogy: "To illustrate, the court's findings would have been similarly erroneous if it had reasoned that because, as a group, men generally have superior physical strength compared to women, the father would better provide a safe environment under factor (b), N.D.C.C. § 14-09-06.2(1)." Majority, at ¶ 21. I agree that such findings would be improper. However, the majority's analogy is incomplete because in this case the district court made specific factual findings as to the parties and the best interests of the children; the court did not simply rely on stereotypes and generalizations about mothers and fathers or breastfeeding.

[¶71] It is improper for courts to determine parental responsibility based on stereotypes and generalizations. However, as acknowledged by the majority, equal treatment of parents does not prevent courts from considering and making specific findings regarding the individual parents and what is in the best interests of the individual child or children. *See* Majority, at ¶ 21. That is what the court did here. Although I may have weighed the specific facts in this case differently than the court did, that is not the standard of review. *Hammeren v. Hammeren*, 2012 ND 225, ¶ 8, 823 N.W.2d 482 ("In applying the clearly erroneous standard, we will not reweigh evidence, reassess witness credibility, retry a custody case, or substitute our judgment for the trial court's decision merely because this Court may have reached a different result.").

[¶72] Some may argue permitting district courts to consider whether a mother is breastfeeding is unfair to the father since he cannot breastfeed. First, as emphasized by the majority, Justice McEvers, and me, any consideration of breastfeeding must be fact specific to the case before the court, not based on stereotypes and generalizations. Second, and more to the point, as stated by the majority, "Neither the fitness of the parents *nor fairness to the parents* is the appropriate test for determining custody, but rather the predominant consideration is the best interests of the child." Majority, at ¶ 10 (emphasis added) (quoting *Klein v. Larson*, 2006 ND 236, ¶ 7, 724 N.W.2d 565).

[¶73] Some may also express concern that a mother may decide to breastfeed to gain a tactical advantage under one or more of the best interest factors. However, whether a mother's breastfeeding is for a tactical advantage is a factual issue that must be determined and weighed by the district court. Courts must regularly consider and weigh the sincerity of a parent's actions when addressing the factually complex and extremely important decision of determining parental responsibility. I trust our courts' ability to properly perform that function.

[¶74] I would affirm the district court.

[¶75] Lisa Fair McEvers
Douglas A. Bahr

30